

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 11, 2015

**VIA ECF, WITH HARD COPY TO FOLLOW**

Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street, Room 1950
New York, NY 10007

> **Re:**   **United States v. Miguel Delacruz**
> **14 Cr. 815 (KBF)**

Dear Judge Forrest:

The Government submits this letter in advance of the defendant's sentencing, which is scheduled for November 13, 2015, at 12:00 p.m.  For the reasons set forth below, the Government respectfully submits that a Guidelines sentence of incarceration is sufficient, but not greater than necessary, to achieve the goals of sentencing.

### Offense Conduct

The defendants in this case agreed with one another to rob an individual who was reputed to be a drug dealer, in an effort to steal from him cash and narcotics that they believed would be in the drug dealer's vehicle.  Unbeknownst to the defendants, however, the planned robbery was part of an operation conducted by the Drug Enforcement Administration ("DEA").  As set forth in greater detail in the Presentence Report ("PSR"), at the direction of the DEA, a cooperating witness ("CW") and a confidential informant ("CI") contacted defendant Alex Velez, who was known to them to be a large scale drug dealer in Philadelphia.  Over the course of the summer of 2014, the CW, CI, and Velez at first discussed a potential narcotics transaction.  Although ultimately that drug deal never occurred, the three also discussed the possibility of Velez robbing a drug supplier in New York.  Specifically, the CW and CI indicated that they desired Velez's assistance in robbing the narcotics of a specific drug dealer, whom they suspected to be receiving a large narcotics shipment in the coming weeks.  Velez then recruited various other individuals

Hon. Katherine B. Forrest                                                                                          Page 2
November 11, 2015

in Philadelphia—the charged defendants, including defendant Miguel Delacruz, to join him in robbing the drug dealer.

Velez recruited Miguel Delacruz shortly after learning of the robbery plan from the CW and the CI.  (PSR ¶ 19).  Delacruz and Velez were friends from childhood, and Velez recruited Delacruz to participate because he had a valid driver's license, owned a car, and because Delacruz was himself involved in selling narcotics.[1] (*Id.*)  Delacruz immediately agreed to participate and offered to serve as the driver for the robbery. (*Id.*)

Velez and Delacruz then travelled twice together from Philadelphia to New York City to meet with the CW and the CI to discuss the details surrounding the planned robbery. (PSR ¶¶ 22, 24).  During the first meeting on October 15, 2014, the CW, Velez, and Delacruz discussed the details of the robbery.  This meeting was surveilled by the DEA and recorded by the CW at the direction of the DEA. Velez and Delacruz were observed arriving in a black Toyota driven by Delacruz.  Velez introduced Delacruz to the CW at the beginning of the meeting as the individual that would serve as the driver for the robbery.  (PSR ¶ 24).  The CW informed Velez and Delacruz that he believed the load of narcotics coming to New York City would consist of 12 kilograms of cocaine and four kilograms of heroin, but noted that the quantities could be more.  The CW also stated to Velez and Delacruz that the SUV carrying the narcotics would be driven by a female that the CI and CW knew, and that the SUV would have 3 occupants, 2 men and the female driver.  The CW indicated that the male occupants of the SUV would likely be carrying firearms. (PSR ¶ 22).  During this October 15 meeting, the CW directly asked Delacruz whether he would be participating in the robbery, and he responded affirmatively.  Velez informed the CW that the robbery crew would consist of five men total, including Delacruz and Velez.  Velez also informed the CW that he and his crew would take care of selling the stolen narcotics in Philadelphia.  The CW indicated to Velez and Delacruz that if they wanted to back out of the robbery, there was still time to do so and that it would not be a problem.  Velez responded that they wanted to proceed with the robbery.  Velez also made statements to the CW

---

[1] Delacruz disputes that he was involved in narcotics trafficking prior to the instant offense.  (*See* Delacruz Submission at 5-6).  During proffer sessions with the Government, Velez informed the Government that Delacruz was involved in selling narcotics.  The Government respectfully submits that, given the seriousness of Delacruz's offense conduct, a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted regardless of whether the Court makes a finding with respect to Delacruz's narcotics trafficking activities prior to the instant offense.  Similarly, the defense claims that Delacruz was only to receive a fee for driving and being a lookout but that he was not going to sell the purported narcotics or share in the profits. (Delacruz Submission at 6).  This is inconsistent with the information provided by Alex Velez during his proffer sessions with the Government.  Again, because of the serious nature of Delacruz's offense conduct, the Government respectfully submits that a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted regardless of whether Delacruz was to be compensated with a fee or with a share of the profits from selling the drugs.  How Delacruz was to be compensated is ultimately irrelevant to his culpability.  There is no dispute that Delacruz was to be paid to be a participant in a robbery that he knew was to be a violent robbery of drug dealers using firearms.  This is gravely serious conduct irrespective of how Delacruz was to be compensated for his role.

– in Delacruz's presence during the meeting – regarding harming the male occupants of the SUV. (PSR ¶ 23).

On November 5, 2014, Velez and Delacruz again drove from Philadelphia to New York City to meet with the CW and the CI.  The meeting was surveilled by the DEA and recorded by the CW and CI at the direction of the DEA.  (PSR ¶ 24).  Velez and Delacruz again arrived at the meeting in a black Toyota driven by Delacruz.  At the beginning of the meeting, the CI asked Velez whether Delacruz would be participating in the robbery and Velez and Delacruz both indicated that Delacruz would be participating.  During the meeting, the CW and CI informed Velez and Delacruz that the load of narcotics that they would be stealing would consist of 16 kilograms of cocaine and 5 kilograms of heroin, and that the drugs would be of a very high quality. (*Id.*)  The CW and CI again informed Velez and Delacruz that the drugs were being transported in an SUV, that a female who was in on the robbery would be driving the SUV carrying the drugs, and that one male would be sitting in the front passenger seat and another male in the backseat.  The CI further related to Velez and Delacruz that he believed one of the men in the SUV would be carrying a firearm.  (PSR ¶ 24).  Velez – again in Delacruz's presence – indicated that they intended to harm the two males riding in the SUV.  During the November 5 meeting, the CW, CI, and Velez also discussed how the proceeds of the drug robbery would be split up amongst them, and Velez suggested that he and his crew would take care of selling the narcotics in Philadelphia.  Velez also indicated during the meeting that members of the robbery crew he had assembled would be bringing firearms to commit the robbery, and that the robbery crew included violent individuals who had participated in a prior shooting. (PSR ¶ 24).  Delacruz was present for the entirety of this discussion, as is clear from the video recording of the meeting.

On November 13, 2014, the day of the robbery, Velez, Delacruz, and co-defendant Giovanny Falero all drove in a Buick operated by Delacruz to meet with co-defendants Eduardo Vasquez-Torres and Ismael Feliciano at a gas station in the outskirts of Philadelphia. (PSR ¶ 27).  While at the gas station, Velez spoke to Feliciano and Vasquez-Torres, who were both inside of a Dodge Durango.  During that conversation, Vasquez-Torres told Velez that they had brought two guns with them that were inside of the Dodge. (PSR ¶ 27).  When Velez returned to the Buick, Velez informed Delacruz and Falero that Vasquez-Torres had brought firearms with him (PSR ¶ 27).  Following this conversation, Velez, Delacruz, and Falero, who were riding in the Buick, and Vasquez-Torres and Feliciano, who were riding in the Dodge, drove together from Philadelphia to New York (PSR ¶ 28).  Once they reached Manhattan, the Buick drove to meet the CI and the CW, whereupon Velez, Falero, and Feliciano got out of the Buick to speak with the CW and the CI.  Velez informed the CW and the CI that another car (i.e., the Dodge Durango) was carrying the other part of the robbery crew and was close by on Riverside Drive.  The CI and the CW told Velez that the robbery was to happen soon, and asked that the other car drive closer to the location.  Velez, Falero, and Feliciano then got back inside the Buick and left the location.  Shortly thereafter, DEA agents conducting surveillance observed the Buick pull up to the Dodge in the vicinity of 165th Street and Riverside Drive.  At this point, Falero and

Feliciano exited the Buick and entered the Dodge.  The Buick and the Dodge were then observed driving back in tandem towards the location where they had previously spoken to the CW and the CI.  At approximately 8:20 p.m., the Buick and Dodge arrived back at 125th Street, east of 12th Avenue, and parked.  Falero was observed exiting the Dodge and again entering the Buick.  The Buick then traveled back to where the defendants had met with the CW and the CI.  Upon the Buick arriving, Velez, Delacruz, and Falero engaged in another conversation with the CW and the CI, which conversation was recorded.  During that conversation, Falero asked the CW and the CI, in sum and substance, whether it would be fine to harm the two drug dealers they intended to rob, and the CW and CI said it would be fine, so long as no harm was done to the woman who was expected to be with the targets.  (PSR ¶ 30).  Furthermore, Delacruz stated that they intended to harm the main target drug supplier. (*Id.*).[2]

At approximately 8:28 PM, the DEA gave the signal to the CW and CI to bring Velez and the rest of the robbery crew to the anticipated location of the robbery.  The defendants were arrested at that time.  At the time of his arrest, Delacruz was located in the driver's seat of the Buick.  He was the only occupant of the Buick.  A subsequent search of the Buick led to the recovery of a suitcase and fabric bag, both empty, from the Buick.  A search of the Dodge that had travelled with the Buick from Philadelphia to New York City led to the seizure of a Rossi .38 caliber revolver from the center console, a loaded Ruger 9-mm semiautomatic handgun between the driver's seat and the center console, gloves, masks, and a large knife.  (PSR ¶ 34).  Velez was arrested after he walked past the parked Dodge.  He was carrying a black bag that had been handed to him by co-defendant Riphy Esquea-Marte.  Velez tossed the black bag over a fence before he was placed under arrest by the DEA.  The DEA recovered the black bag and found a Lorcin 380 semiautomatic weapon inside of the bag.

### Delacruz's Plea Agreement and Applicable Guidelines Range

On or about August 12, 2015, Miguel Delacruz pleaded guilty pursuant to a plea agreement to Count One of the Indictment, 14 Cr. 815 (KBF).  Count One charges Delacruz with

---

[2] The defense submission disputes that Delacruz made statements that he was going to harm the main target drug supplier, and claims that "the transcripts of the meetings that were provided to defense counsel by the government contain no such statement by Mr. Delacruz." (Delacruz Submission at 3).  The draft transcripts that were provided to defense counsel do not contain attribution as to the identity of each speaker.  The Government only engages in the time-consuming process of attribution when a case proceeds to trial.  That process requires the Government to sit with a person who is familiar with the voices of the various speakers on a recording – in this case Alex Velez – and go through each and every statement on the recordings and attribute those statements to each individual speaker.  With that said, in preparing for trial against Delacruz, the Government played the recording of the November 13, 2014 conversation between Falero, Delacruz, Velez, the CW, and the CI for Alex Velez.  Velez identified Miguel Delacruz's voice on the recording, and he specifically attributed the following statement to Delacruz: "[T]hat guy . . . that guy is going to cry like a sissy."  The Government respectfully submits that the Court need not determine whether Delacruz made this statement in order to conclude that a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted.  Given the seriousness of Delacruz's offense conduct, irrespective of whether he made this particular statement on the day of his arrest a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted.

participation in a conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2.  The applicable offense level, as calculated by both the Plea Agreement and the Probation Office, are in accord:  a total offense level of 23.  *See* PSR ¶¶ 8, 41-51.  As is reflected in the PSR and the Plea Agreement, Delacruz has 0 criminal history points and his Criminal History Category is I.  (PSR ¶¶ 8, 54-55).  Accordingly, based on the total offense level of 23 and the Criminal History Category of I, the defendant's Guidelines range is 46 to 57 months' imprisonment. (PSR ¶ 77).

## A Within-Guidelines Sentence Is Appropriate

The general purposes of sentencing include the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).  In addition, the particular sentence imposed must consider the nature and circumstances of the offense and the history and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a)(1).  The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports the imposition of a sentence within the applicable Guidelines range.

A substantial sentence is necessary in this case to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(1), (2)(A).  While the defense in its submission claims that Delacruz "was not part of the actual robbery crew but was rather the driver/lookout," (Delacruz Submission at 6), this characterization understates Delacruz's role substantially.  Delacruz, in fact, like all of his six other co-defendants, was an integral part of the robbery crew.  Different members of that robbery crew played different roles.  Delacruz's role was to act as a driver of the one of the vehicles that would carry the stolen narcotics.  Furthermore, Delacruz was present for crucial planning meetings leading up to the planned robbery.  Delacruz drove from Philadelphia to New York City with Velez on two separate occasions in order to meet with the CW and the CI to discuss the robbery.  Delacruz was relatively quiet during these meetings, as is reflected in the transcripts and recordings of the meetings, and he was introduced by Velez as the driver for the robbery.  Nevertheless, he was present for discussions that covered all of the relevant details of the planned robbery:  the quantity of drugs that would be stolen, the means that would be used to achieve that end, and the fact that robbery crew would bring firearms to effectuate the robbery. (PSR ¶¶ 22-24).  Furthermore, the fact that the robbery crew would harm the male occupants of the SUV carrying the narcotics was also discussed in Delacruz's presence. (*Id.*).  In addition, on the day of the robbery itself, following the meeting at the gas station, Velez told Delacruz and Falero that Vasquez-Torres had brought firearms with him to commit the robbery, and that he had these firearms stored inside of the Dodge. (PSR ¶ 27).  Accordingly, when Delacruz drove with the other members of the robbery crew to New York City on November 13, 2014, he understood full well that he was about to participate in a violent, armed robbery of drug dealers.

Moreover, Delacruz was allowed to enter an agreement to plead guilty only to Count One, but not Counts Two or Three, which would have resulted in a mandatory minimum of 15 years' imprisonment (the 10-year mandatory minimum from the 21 U.S.C. § 846 charge, as well as the additional 5 years' imprisonment from the 18 U.S.C. § 924(c) charge). The plea agreement in this case thus reflects a measured approach to the offense and sentencing. Nevertheless, the defense implies in its submission that because Delacruz was permitted to plead guilty to solely Count One, which carries no mandatory minimum sentence, that this somehow suggests that the Government contemplated a sentence below the Guidelines Range. (Delacruz Submission at 5). This is simply not the case. While it is true that Delacruz was the only defendant permitted to plead guilty to only Count One, this was due to the fact that the Government determined that Delacruz's offense conduct – while quite serious – was less serious than that of his co-defendants because Delacruz was solely to act as the driver for the robbery. Accordingly, the plea agreement already reflects significant leniency toward Delacruz given the seriousness of the offense conduct, and the Government respectfully submits that further leniency is unwarranted.

The defendant's submission and the PSR both discuss that Delacruz has no prior arrests or convictions, that he has worked full time since 2004, and that he is married with children. The Government certainly acknowledges that Delacruz does not have a criminal history, and that he appears to have been gainfully employed for many years. These facts are certainly relevant for the Court to consider in applying the Section 3553(a) in this case. Nevertheless, a sentence within the Guidelines Range appropriately balances the defendant's serious offense conduct and the need for general and specific deterrence against the history and characteristics of Delacruz.

Hon. Katherine B. Forrest                                                                                   Page 7
November 11, 2015


       Given the serious nature of the crime that Delacruz elected to participate in, the sentence of time-served or below the Guidelines Range requested by the defendant would inadequately serve the purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).  A Guidelines sentence is necessary to serve the ends of sentencing—including promoting respect for the law, providing just punishment for this particular defendant, and serving the needs of both specific and general deterrence.


           Respectfully submitted,

           PREET BHARARA
           United States Attorney


By:

           Noah Solowiejczyk
           Eun Young Choi
           Assistant United States Attorneys
           Southern District of New York
           (212) 637-2473/2187